# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

UNITED STATES OF AMERICA,

v.                                                    Case No. 25-cr-456-KKM-AAS

DESIREE DOREEN SEGARI,

    Defendant.

_____

## ORDER

In August 2025, Desiree Doreen Segari posted TikTok videos of herself announcing a "new movement," which she coined "see MAGA, shoot MAGA." Trial Ex. 2 at 0:02–0:05. In Segari's words, "if we all get our guns and use our second amendment right . . . and you see somebody with a MAGA hat, pew pew that's what we do, that's the way, it's the only way." *Id.* at 0:20–0:36. Segari explained that "MAGA people deserve to be terrified and scared to walk in the streets because they should know that real Americans are gonna [mouths the word "fucking"] kill them." *Id.* at 0:47–0:53. Based on these and similar statements in TikTok videos, a jury convicted Segari of transmitting in interstate commerce a true threat to injure another person. *See* Jury Verdict (Doc. 73); Indictment (Doc. 1) at 1.

At the close of the government's case, Segari moved for judgment of acquittal under Federal Rule of Criminal Procedure 29(a) and submitted a PowerPoint presentation in support. *See* Oral Mot. (Doc. 71); Clerk's Mins. (Doc. 70) at 2; Notice of Filing PowerPoint Presentation (Doc. 69). I reserved ruling on the motion and permitted the government and Segari to submit additional briefing following the verdict. *See* Clerk's Mins. at 2–3; (Doc. 75). The government responds in opposition to the motion, Resp. (Doc. 76), and Segari replies in support, Reply (Doc. 80).[1] Because a reasonable jury could find that the evidence establishes Segari's guilt beyond a reasonable doubt, I deny the motion.

## I.    BACKGROUND

In September 2025, a grand jury indicted Segari for transmitting in interstate commerce a true threat to injure the person of another in violation of 18 U.S.C. § 875(c). Indictment at 1. The grand jury indicted Segari based on two videos that she posted to TikTok. *See id.* In the first video, posted on August 17, 2025, Segari states that people wearing a MAGA hat should be shot:

> Ok guys, so I would like to start a new movement called see MAGA [shoot] MAGA, because people like that respond to fear and terror and aggression not

---

[1] In her reply brief, Segari suggests that she "is limited" in replying and "renews" all earlier arguments for lack of space. Reply at 1 n.1. At the Rule 29 motion portion of trial, Segari's counsel argued for approximately twenty-four minutes and submitted a brief in the form of a thirty-three-page PowerPoint. I also granted in full Segari's motion to extend the page limits to her reply. (Doc. 79).

> logic and empathy and I don't know, intelligence, it doesn't work for them so fear works so if we all get our guns and use our second amendment right and our common sense at this point this administration is begging us to rise up and revolt and you see somebody with a MAGA hat pew pew that's what we do, that's the way, it's the only way. Put them back in their basements, make them scared again to be racist, homophobic, and terrible just awful fucking pieces of shit because I would way rather live next to anyone other than MAGA people. MAGA people deserve to be terrified and scared to walk in the streets because they should know that real Americans are gonna [mouths the word "fucking"] kill them.

Trial Ex. 2T (Doc. 81-2). Segari balls her fist and points her index finger to mimic a firearm when saying, "see someone with a MAGA hat pew pew that's what we do." *See* Trial Ex. 2 at 0:28–0:34.

The next day, Segari posted another video, continuing the same themes from the first:

> See MAGA pew pew MAGA, see MAGA pew pew MAGA, see MAGA pew pew MAGA so these motherfuckers know we ain't here to play, you can't run around and fuck with our neighbors you can't be a homophobic piece of shit, you can't just be generally awful and be ok with kids getting ripped away from their moms and all these terrible things happening just because you think it won't happen to you even though anything that you allow your government to do to other people they will eventually do to you and that's why Trump is taking over in D.C. and we're living in a police state.

Trial Ex. 5T (Doc. 81-5); *see generally* Trial Ex. 5. Segari continued to mimic a firearm when saying, "see MAGA pew pew MAGA." *See* Trial Ex. 5 at 0:01–0:06.

One of the government's witness, Timothy Miles, testified that, while sitting at home in Ohio, he watched the first of the two charged videos that Segari posted. Miles also testified that he reported the video to the FBI because of its threatening nature. Segari did not testify or present evidence. *See* Clerk's Mins. at 2. After deliberating for less than one hour, the jury convicted Segari. *See id.* at 1–3.

## II.  LEGAL STANDARD

Rule 29(a) of the Federal Rules of Criminal Procedure provides that, "[a]fter the government closes its evidence, or after the close of all the evidence," the trial court "on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." "In deciding a Rule 29 motion for judgment of acquittal, a district court must determine whether, viewing all the evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *United States v. Grigsby*, 111 F.3d 806, 833 (11th Cir. 1997) (citation modified). "A

conviction must be affirmed unless there is no reasonable construction of the evidence from which the jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Ignasiak*, 667 F.3d 1217, 1227 (11th Cir. 2012) (citing *United States v. Garcia*, 405 F.3d 1260, 1269 (11th Cir. 2005) (per curiam)).

The Court "may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion . . . after [the jury] returns a verdict of guilty." FED. R. CRIM. P. 29(b). When reserving decision, the Court "must decide the motion on the basis of the evidence at the time the ruling was reserved." *Id.*

## III. ANALYSIS

Section 875(c) prohibits "transmit[ting] in interstate or foreign commerce any communication containing any threat to . . . injure the person of another." A true threat is a serious expression conveying that a speaker means to "commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). "The existence of a threat depends not on 'the mental state of the author,' but on 'what the statement conveys' to the person on the other end." *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (citing *Elonis v. United States*, 575 U.S. 723, 733 (2015)). "True threats subject individuals to 'fear of violence' and to the

many kinds of 'disruption that fear engenders.'" *Id.* (quoting *Black*, 538 U.S. at 360).

"To obtain a conviction under section 875(c), the government must prove beyond a reasonable doubt that (1) a communication was transmitted in interstate commerce; (2) the communication contained a threat; and (3) the defendant intended to issue threats or knew they would be perceived as such." *United States v. Franks*, No. 24-11546, 2025 WL 2732412, at *1 (11th Cir. Sept. 25, 2025) (per curiam) (first citing 18 U.S.C. § 875(c); and then citing *Elonis*, 575 U.S. at 732). The government may establish the third element through "a showing of recklessness." *See id.* (citing *Counterman*, 600 U.S. at 79). "In the threats context, [recklessness] means that a speaker is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'" *Counterman*, 600 U.S. at 79 (quoting *Elonis*, 575 U.S. at 746 (Alito, J., concurring in part and dissenting in part)).[2]

---

[2] Segari does not argue that the government failed to introduce sufficient evidence for a reasonable jury to find the third element beyond a reasonable doubt. Even if she had, the government's evidence on that element was sufficient for a reasonable jury to infer that Segari was at least aware that others could regard her statements as threatening violence and delivered the statements anyways. Segari's statements themselves are sufficient for such an inference: she states she will shoot people and, in the first video, Segari expresses her goal that members of MAGA be "terrified and scared to walk the streets because they should know that real Americans are gonna . . . kill them." Trial Ex. 2T. Further, in another video that Segari posted between the two videos for which she was charged, Segari again states that her goal is to "make [members of MAGA] believe that we are going to [kill them] so they stop doing what they are doing." Trial Ex. 3T (Doc. 81-3).

Segari advances three distinct arguments in her motion. First, Segari avers that the government failed to introduce evidence that she transmitted her videos in interstate commerce. *See* Mot. (Doc. 69-1) at 3. Second, Segari contends that Section 875(c) requires proof that a defendant threatened to injure "a specific, identifiable person," and the government failed to do so here. *See id.* Third, Segari argues that the videos are not "true threats" as a matter of law, primarily because her statements were "just too general in nature and not specific enough to be considered a 'true threat.'" *Id.* at 3, 33.

## A. Segari Transmitted Her Threat in Interstate Commerce

Segari admits that she posted her videos to TikTok. Segari does not contend that a witness's testimony that he saw her first video while in Ohio is insufficient for a reasonable jury to find that the video crossed state lines. *Compare* Resp. at 4, 14 (averring that the testimony is sufficient evidence), *with* Mot. at 13–22 (failing to raise any related argument), *and* Reply at 6 (arguing only that this testimony is insufficient because the witness's testimony did not show which TikTok server, whether in Florida or elsewhere, first received the videos). Instead, Segari raises two arguments. First, because the statute prohibits transmission of threats "in interstate . . . commerce," as opposed to broader formulations, such as, "in or affecting interstate of foreign commerce," or "using any means or facility of interstate or foreign commerce," Congress limited the reach of Section 875(c) to actions done directly in

commerce, excluding actions that only use the channels or instrumentalities of commerce to facilitate their commission. *See* Mot. at 13–14. Second, the statute punishes only "the transmission of a threat at its inception," which required the government to "prove that the first transmission of . . . Segari's TikTok videos . . . [was] sent *directly* out of Florida without any intervening stops in other cities along the way." *See id.* at 4, 13–17.

Based on Segari's construction of what "in interstate commerce" means for Section 875(c), Segari contends that the government's evidence on that element fails. Segari posted her videos to TikTok from Sarasota, Florida, and TikTok has a server in Miami, Florida. *Id.* at 18. The government proved only that the videos containing the threats were uploaded to the Internet and ultimately crossed state lines to Ohio. So Segari argues that the government's failure to prove that, when she uploaded her videos, the videos "did not travel to Miami first before traveling outside of Florida" is fatal. *Id.* (emphasis removed). The government responds that evidence of posting the threats to the Internet is sufficient given that "the realities of the Internet and its functioning make it plain" that "by posting a message on social media, the user is sending or transmitting messages in interstate commerce." Resp. at 8.

Although the Eleventh Circuit has not addressed what is required to establish that a threat was transmitted "in interstate commerce" in the context of Section 875(c), the Eleventh Circuit has answered that question in similar

8

contexts that inform Section 875(c) and counsel in favor of the government's position. In *United States v. Tovar*, the Eleventh Circuit rejected a challenge to a conviction under 18 U.S.C. § 1591(a)(1), which requires proof that the defendant committed acts "in or affecting interstate or foreign commerce." *See* 146 F.4th 1318, 1325 (11th Cir. 2025), *petition for cert. filed*, (U.S. Dec. 8, 2025) (No. 25-6344). In explaining why the government's evidence sufficed, the Eleventh Circuit held that "[t]he phrase 'in commerce' refers to both the 'channels within which people and goods move through the flow of commerce' and the 'instrumentalities used to facilitate that movement.'" *Id.* (quoting *United States v. Ballinger*, 395 F.3d 1218, 1233 (11th Cir. 2005) (en banc)). Instrumentalities of commerce "include things like the [I]nternet and cell phones." *Id.* (first citing *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004); and then citing *United States v. Evans*, 476 F.3d 1176, 1180 (11th Cir. 2007)). Because Tovar used the Internet and his cell phone to facilitate the offense, his use of these instrumentalities of commerce "placed him[] firmly 'in commerce.'" *Id.* at 1326 (quoting *United States v. Baston*, 818 F.3d 651, 664 (11th Cir. 2016)).

Indeed, the Eleventh Circuit holds that use of an instrumentality to facilitate an offense alone satisfies an "in interstate commerce" element, even if the illegal acts all occur intrastate. In *Baston*, when examining again Section 1591(a), the Eleventh Circuit held that the defendant's communications with

9

his victim "by phone, text message, and Instagram" *each* were independently sufficient to prove that the defendant's conduct was "in commerce." 818 F. 3d at 664. That holding comports with the Eleventh Circuit's earlier holding in *Evans*. 476 F.3d at 1180–81. There, when considering 18 U.S.C. § 2422(b)'s requirement that the defendant "us[e] the mail or any facility or means of interstate or foreign commerce," the Eleventh Circuit held that the defendant's use of a cell phone "alone, even without evidence that the calls he made were routed through an interstate system," was sufficient to satisfy the statute's interstate-commerce element. *Id.* (first citing *United States v. Gilbert,* 181 F.3d 152, 158–59 (1st Cir. 1999); and then citing *United States v. Weathers,* 169 F.3d 336, 341–42 (6th Cir. 1999)).

Neither party cites, much less engages with, *Tovar*, *Baston*, or *Evans*. Instead, Segari asks me to adopt the minority view of a circuit split about whether the government must prove that the transmissions crossed state lines or if use of the Internet alone suffices to prove the interstate commerce element. *Compare United States v. Wright*, 625 F.3d 583, 590–600 (9th Cir. 2010) (holding that a statute that, at the time of the offense, prohibited transporting or shipping child pornography "in interstate or foreign commerce" required the government to prove that the "images actually crossed state lines"), *superseded by statute as recognized by United States v. Brown*, 785 F.3d 1337, 1351 (9th Cir. 2010), *and United States v. Schaefer*, 501 F.3d 1197, 1200–

02 (10th Cir. 2007) (same regarding a different but related statute), *superseded by statute as recognized by United States v. Kieffer*, 681 F.3d 1143, 1153 (10th Cir. 2012), *and overruled in part by United States v. Sturm*, 672 F.3d 891, 901 (10th Cir. 2012), *with United States v. Lewis*, 554 F.3d 208, 212–16 (1st Cir. 2009) (holding that a statute that, at the time of the offense, prohibited receiving child pornography that had been shipped or transported "in interstate or foreign commerce" only required the government to prove that the defendant used the Internet to receive the videos), *and United States v. Rowe*, 414 F.3d 271, 278 (2d Cir. 2005) (same regarding a different statute), *and United States v. MacEwan*, 445 F.3d 237, 243–44 (3d Cir. 2006) (same regarding a different statute and noting that the defendant raising a similar argument to Segari's has "conflat[ed] 'interstate commerce' with 'interstate transmission' "), *and United States v. Runyan*, 290 F.3d 223, 239 (5th Cir. 2002) (same regarding a different statute).

The circuit split, at least in part, concerns the scope of commerce-related activities that the statutes cover, based on Congress's varying formulations. *See Wright*, 625 F.3d at 590–94 (explaining that, for example, criminal statutes without modifiers like "facility" or "instrumentalities" focus on the specific act and its relation to interstate commerce, and thus require proof that state lines were crossed as part of the prohibited act, while statutes with those modifiers focus on the means used by the defendant and the connection of those means

to interstate commerce, ultimately encompassing a broader swath of conduct). Segari's first argument asks me to follow the Ninth Circuit's approach to conclude that Section 875(c)'s requirement that the threat be "in interstate . . . commerce" narrows the reach of the statute by excluding "channels" and "instrumentalities," *i.e.*, the Internet. Eleventh Circuit precedent does not appear to parse different formulations of the interstate commerce requirement and has impliedly foreclosed that cabined reading of "in commerce" since at least 2005. *See Ballinger*, 395 F.3d at 1233. And, as explained above, it recently reaffirmed that "[t]he phrase 'in commerce' refers to both the 'channels within which people and goods move through the flow of commerce' and the 'instrumentalities used to facilitate that movement.'" *Tovar*, 395 F.3d at 1233; *cf. United States v. Nichols*, 124 F.3d 1265, 1266 (11th Cir. 1997) (per curiam) (explaining that "the Supreme Court has held that the phrase 'in or affecting commerce' indicates a Congressional intent to assert its full Commerce Clause power"). As a result, the government's evidence that Segari used the Internet to transmit the TikTok videos satisfies the transmission "in commerce" requirement. *Cf. United States v. Machtley*, 163 F. App'x 837, 839 (11th Cir. 2006) (per curiam) ("The use of the internet to transmit or receive child pornography is interstate commerce.").

But even disregarding (which I cannot) that expansive view of "in commerce," the government presented evidence that Segari's videos were

transmitted across state lines, which means that Segari's first argument also fails under the minority view of the circuit split. Under that approach, it is irrelevant whether Segari's videos traveled first to a TikTok server in Miami or if they crossed state lines immediately after her upload in Sarasota. Segari does not dispute that the government presented evidence that she uploaded the videos to TikTok and that at least one individual viewed the first video in Ohio, meaning that the videos crossed state lines. Those facts permit a reasonable jury to conclude that the government's evidence satisfied the minority approach. *See, e.g.*, *Wright*, 625 F.3d at 590–600 (minority view).

Although the government does not address it, buried within Segari's argument is a misunderstanding of causation. To "transmit" means "to send or convey from one person or place to another." *Transmit*, Merriam-Webster, https://www.merriam-webster.com/dictionary/transmit (last visited March 2, 2026)[3]; *see also Transmit*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining transmit as "[t]o send or transfer (a thing) from one person or place to another" and "to communicate"). Section 875(c) thus bars sending or conveying a threat from one person to another in interstate commerce. Under Eleventh Circuit precedent, using an instrumentality, *i.e.*, the Internet, to send a threat from one to another is enough. Under a more narrow approach to the interstate

---

[3] https://perma.cc/M4WJ-JHYD

commerce element, sending a threat from one to another across state lines is enough.

Segari's argument is different altogether though. Segari contends that Section 875(c) "punishes the transmission of a threat at its inception—not the later dissemination of that threat to others, by others, in interstate commerce." Mot. at 17. Implicit in her argument is a mistaken view that, if the post went first to the server in Miami, she is no longer the one "transmitting" her posts if then sent to TikTok servers elsewhere or viewed by others on her TikTok account. By uploading videos to TikTok—a social media platform that uses the Internet to display account holders' messages—Segari herself transmitted them across state lines to whomever viewed them on her account. "Transmission" in Section 875(c) refers, at least in the first instance, to the TikTok user's action. Whatever responsibility TikTok may or may not have for its users' content, Segari certainly caused her videos to be passed from her account to those with access to view her account, including the witness in Ohio. By pressing upload, whether the electromagnetic waves first hit the Miami server or an out-of-state server, a reasonable jury could conclude that Segari both proximately and directly caused the videos' transmission.

The fallacy of the "first server" argument becomes clear when adapted to the mail context. For example, if a person mails a threat to an address in another state, that the mail may first arrive at a nearby U.S. Postal Service

facility in the sender's state does not mean that the sender is not the cause of the threat's transmission across state lines when the Postal Service delivers it to the out-of-state address. *Cf. United States v. Haas*, 37 F.4th 1256, 1266 (7th Cir. 2022) ("[The jury] remained at liberty to conclude . . . that [the defendant] knowingly used [a social media website] to facilitate an interstate transmission, just as one would use the Post Office, UPS, or FedEx to mail a letter rather than personally driving it across state lines."). Whether her videos made an interim stop at a server in Miami matters not for purposes of the meaning of "transmission."

The government's evidence was sufficient for a reasonable jury to find that Segari transmitted the threat in interstate commerce.

### B. Section 875(c) Applies to Threats Against Groups

Segari contends that Section 875(c)'s prohibition on "any threat to kidnap any person or any threat to injure the person of another" limits its reach to threats directed at a singular, particular person but not threats against people or a "group of persons." Mot. at 23–24. Because the government presented no evidence that she "threatened to injure a single, solitary person," Segari argues that the Rule 29 motion should be granted. In the alternative, Segari argues that "penal laws are to be construed strictly," and the statutory language is "vague and ambiguous"—triggering the rule of lenity. *Id.* at 24–28 (citation modified). According to Segari, this vagueness prevented her from

15

having "notice that speech could be penalized," thus causing "a Fifth Amendment Due Process violation." *Id.* at 25. The government responds that the statute is not ambiguous, applies to threats directed at people or groups of persons, and thus provided notice to Segari that her actions were unlawful. *See* Resp. at 14–22.

Congress's use of "person of another" in Section 875(c) includes both the singular and plural form of person. This is simply good drafting. The formal rule adopted by Congress is "that unless the context indicates otherwise," "words importing the singular include and apply to several persons, parties, or things." *See* The Dictionary Act, 1 U.S.C. § 1. This semantic rule comports with "common sense and everyday linguistic experience." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 14, at 130 (2012). Scalia and Garner provide a good example: " 'It is a misdemeanor for any person to set off a rocket within the city limits without a written license from the fire marshal' does not exempt from penalty someone who sets off two rockets or a string of 100." *Id.* So too here. A threat to injure another person does not preclude from prosecution a threat to injure a group of persons.

Of course, the semantic rule of the singular-includes-the-plural yields when context indicates a different meaning, but none appears in Section 875(c). Instead, the context informs the reader that Section 875(c)'s use of "person of another" prohibits threats against *other* people, not against oneself. The

16

statute bars "any threat to kidnap any person or any threat to injure the person of another." "Kidnapping" generally means "[t]he crime of seizing and taking away a person by force or fraud, usually to hold the person prisoner in order to demand something from his or her family, employer, or government." *Kidnapping*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also* 18 U.S.C. § 1201(a). One cannot commit those acts against oneself, so "any person" suffices for barring threats of kidnapping. Not necessarily so for threats to injure. The additional "person of another" provides clarity then by proscribing only threats against someone different than the speaker. *See Borden v. United States*, 593 U.S. 420, 429 (2021) (when addressing whether a statute satisfies the Armed Career Criminal Act elements clause, concluding that "[t]he phrase 'against another,' when modifying the 'use of force,' demands that the perpetrator direct his action at, or target, another individual."). In sum, the context of Section 875(c) tells the reader that he may not transmit in interstate commerce threats—whether one or many—to injure other people—whether one or many.[4]

---

[4] In relevant part, 18 U.S.C. § 876(c) criminalizes, similarly, "any threat to injure the person of the addressee or of another." When considering a threat to "slay your children," when the circumstances made it "impossible to determine (and is highly unlikely) that" the maker of the threat "was addressing any particular person whose children he was going to slay," the Ninth Circuit noted that "[o]f course, a threat to kill any children qualifies as a *threat* made to the person 'of another than the addressee.'" *United States v. Havelock*, 664 F.3d 1284, 1296 & n.10 (9th Cir. 2012).

Segari contends that Section 875(c) requires not only singularity, but also specificity of identity. Segari cites no caselaw for support nor explains what part of the text requires the degree of specificity that she demands. *Cf. United States v. Cox*, 957 F.2d 264, 266 (6th Cir. 1992) (per curiam) (affirming a conviction under Section 875(c) and "not read[ing] the statute to be so limited" as to require that the threat "identify any specific person or group"). Regardless, it is properly the jury's prerogative to discern who the target of Segari's threat was and, relatedly, if the statement constituted a true threat against that target. *See United States v. Khan*, 937 F.3d 1042, 1055–56 (7th Cir. 2019) (rejecting a similar argument that the government failed to prove "the target of the alleged threats" when considering a sufficiency challenge to a Section 875(c) conviction for threats made to "targets," "college students," "people walking their dogs," and "truckers" "who happened to be in the wrong place (the defendant's defined 'free kill zone') at the wrong time" (citation modified)). And even if a case could present a threat that was so opaque and diffused that an identifiable target would be impossible, that is not this case.[5]

---

[5] A couple examples highlight why Segari's argument about Section 875(c) requiring singularity and specificity of the target cannot withstand scrutiny. Under her reasoning, each of the following defendants would be entitled to a Rule 29 judgment of acquittal. A Hamas member announces on social media, "see Jewish people, shoot Jewish people" and "if you see someone who is wearing a yarmulke, shoot them." Or a Ku Klux Klan member announces on social media, "see Black people, shoot Black people" and "if you see someone who looks Black, shoot them." These targets are numerous and differentiated, but both cases would properly remain a jury question.

18

The government presented sufficient evidence for the jury to conclude who Segari intended to threaten. Segari stated several times, "see MAGA, shoot MAGA," or "see MAGA, pew pew MAGA," Trial Ex. 2 at 0:03–0:05; Trial Ex. 5 at 0:01–0:08, and provided an example of how she would identify persons within that group: "you see somebody with a MAGA hat pew pew." Trial Ex. 2 at 0:29–0:32.

Because the statute is clear about what it prohibits, Segari's invocation of the rule of lenity and due process concerns about vagueness are misplaced. "Statutory language is ambiguous if it is susceptible to more than one reasonable interpretation." *United States v. Chafin*, 808 F.3d 1263, 1271 (11th Cir. 2015) (citation modified). As explained above, there are not multiple reasonable interpretations of Section 875(c) concerning the numerosity of victims or the level of particularization. Moreover, it is unclear what Segari's theory of vagueness is regarding Section 875(c). She raises the vagueness challenge in passing and does not explain her argument beyond stating that, if threats against groups of people are included, this would "go[] beyond the language of the statute." Mot. at 25. That is not a dispute about ambiguity, but a disagreement about the construction of the statute. Further, "[t]he rule of lenity . . . applies only when, after consulting traditional canons of statutory construction, [the Court is] left with an ambiguous statute." *United States v.*

*Shabani*, 513 U.S. 10, 17 (1994). Section 875(c) is unambiguous and the rule of lenity has no place here.

Because Section 875(c) does not limit threats to only a "single, identifiable person," Mot. at 28, Segari's second Rule 29 argument fails.

### C. Segari's Threat was a True Threat

Segari contends that her threats were "just too general in nature and not specific enough to be considered a 'true threat.' " *Id.* at 33. By this she means that "generalized threats of violence" against members of "the MAGA movement – an incalculable and imprecise group of adherents of a political ideology" lack sufficient specificity to be a true threat, thus rendering her statements protected political speech. *See* Reply at 10; *see also* Mot. at 33 (pressing the view that her speech was "satirical" and "the mere advocacy of violence towards MAGA"). The government responds that the question of whether Segari's speech constitutes a true threat was an issue for the jury. Resp. at 23.

"Whether a communication is a threat is a question of fact to be left to the jury." *United States v. Davis*, 854 F.3d 1276, 1293 (11th Cir. 2017) (quoting *United States v. Matthews*, 431 F.3d 1296, 1310 (11th Cir. 2005) (per curiam)) (citation modified). All federal courts of appeals appear to agree on this point. *See, e.g.*, *United States v. Parr*, 545 F.3d 491, 497 (7th Cir. 2008); *United States*

20

*v. Viefhaus*, 168 F.3d 392, 397 (10th Cir. 1999); *United States v. Kosma*, 951 F.2d 549, 555 (3d Cir. 1991).

Viewing the videos in the light most favorable to the government, a reasonable jury could find that the evidence established that Segari's statements were true threats. In her first video, Segari's statement that "you see someone with a MAGA hat pew pew that's what we do . . . it's the only way," which she says while mimicking a firearm with her hand is sufficient for a reasonable jury to find her guilty. Trial Ex. 2 at 0:28–0:35. This is particularly so when she preceded the statement by noting that "fear works," and she referred to "get[ting] our guns." *Id.* at 0:19–0:22. Segari expounded on her threat by explaining that "MAGA people deserve to be terrified and scared to walk in the streets because they should know that real Americans are gonna [mouths the word "fucking"] kill them." *Id.* at 0:47–0:52. In the second video, Segari repeats "see MAGA pew pew MAGA" multiple times while mimicking a firearm and then adds "so these motherfuckers know we ain't here to play." Trial Ex. 5 at 0:01–0:10. A reasonable jury could find that the statements in these videos were not satirical or "the mere advocacy of violence," and instead constituted a true threat.

As to whether the intended targets were too "incalculable and imprecise," Reply at 10, Segari identifies the targets as the MAGA movement, and, in particular, people wearing a "MAGA hat." Segari's language of "see

21

MAGA, shoot MAGA" similarly would allow a reasonable jury to conclude that she intended to target individuals who in their appearance identify as MAGA. A reasonable jury could conclude that the victims of her threat were not too general and unspecific to constitute a true threat.

Although this is a Rule 29 motion, the jury received instructions on what constitutes a true threat and a theory of defense instruction. Jury Instrs. (Doc. 72) at 13–15. The offense instruction informed the jury that "a 'true threat' is a serious threat—not idle talk, political hyperbole, a careless remark, or something said jokingly—that is made under circumstances that would place a reasonable person in fear of being physically injured." *Id.* at 13. The defense theory instruction informed the jury that Segari contends that her statements were protected political speech under the First Amendment, not true threats. *Id.* at 15. The instructions told the jury that if they "have a reasonable doubt as to whether the statements made in the videos were a 'true threat,' [they] must find Ms. Segari not guilty." *Id.* Courts assume juries follow the instructions.

Further, the jury's verdict here is consistent with *Black*, where "the Supreme Court rejected the First Amendment contentions of a man who led a cross-burning rally, not in the yard of a particular individual or on the property of a specific group, but in a field owned by another man *who had consented to the ritual.*" *United States v. Hussaini*, No. 19-60387-CR, 2022 WL 138474, at

*9 (S.D. Fla. Jan. 14, 2022) (citing 538 U.S. at 348); *see Black*, 538 U.S. at 362 ("Virginia's statute does not run afoul of the First Amendment insofar as it bans cross burning with intent to intimidate."). In *Black*, there was "no argument . . . that the defendant had targeted any *specific* individual or group—other than the very broad swaths of the population that have traditionally been targeted by cross burners (blacks, Jews, etc.)." *Hussaini*, 2022 WL 138474, at *6–9 (explaining that, in the light of *Black*, a reasonable jury could find that generalized threats to "blacks and Christians" constituted true threats). Similarly, a reasonable jury could—and did—conclude that Segari's threat against a broad swath of the population was a true threat. *See Khan*, 937 F.3d at 1055–56.

## IV. CONCLUSION

The government provided sufficient evidence that Segari transmitted a threat in interstate commerce, both by using the Internet and the threat crossing state lines. Section 875(c) is not limited to a singular and specific individual, thus the government did not need to prove that Segari "threatened to injure a single, solitary person." Finally, a reasonable jury could conclude that Segari's statements were a true threat. For these reasons, the Rule 29 motion is denied.

Accordingly, the following is **ORDERED:**

1.    Defendant Segari's Rule 29 Motion for Judgment of Acquittal

(Doc. 71) is **DENIED**.

**ORDERED** in Tampa, Florida, on March 9, 2026.

Kathryn Kimball Mizelle
United States District Judge